THE HAUCK FOOD PRODUCTS CORPORATION, Respondent, *v.* E. A. STEVENSON & CO., INC., Appellant.

Third Department, November 15, 1922.

Sales — action by buyer to terminate contract — counterclaim for failure of plaintiff to accept one carload — contract provided that in case of insolvency of either party other might close contract — contract was for sale " f. o. b. Pacific Coast " — seller's insolvency occurred October 30, 1920, car reached destination November 4, 1920 — usual time of shipment was three weeks — title passed at point of shipment and before insolvency — plaintiff had no right to close contract and refuse shipment.

In an action by the buyer to terminate and avoid a contract for the sale of soya bean oil the defendant interposed a counterclaim based on the failure of the plaintiff to accept one carload of the oil. The price stated in the contract was " f. o. b. Pacific Coast " and the contract provided that if before its completion either party thereto should become insolvent the other party, upon notice being given to the defaulter, might close the contract forthwith. In the usual course of transportation a shipment from the Pacific coast to the plaintiff's place of business would require three weeks' time. The seller became insolvent on the 30th day of October, 1920, and the car of oil in question reached its destination on November 4, 1920, and on the same day the plaintiff notified the seller that it elected, under the contract clause, to terminate the contract and requested · that the seller cancel the said car of oil.

*Held,* that when a sale is made " f. o. b. the point of shipment " title passes from
the seller to the buyer at the moment of delivery to the carrier, whether the bill
of lading runs to the consignor, to the consignee or to the consignor's agent.

Accordingly, the title to the car of oil must have passed to the plaintiff prior to
the insolvency of the seller since four days only elapsed between the seller's
insolvency and the arrival of the car.

Therefore, at the time the plaintiff notified the seller that it elected to terminate
the contract the seller had fully performed its contract in every particular and
nothing remained for it to do and the plaintiff did not then have the right to
close the contract and to refuse the shipment.

HASBROUCK, J., dissents, with opinion.

APPEAL by the defendant, E. A. Stevenson & Co., Inc., from a
judgment of the Supreme Court in favor of the plaintiff, entered
in the office of the clerk of the county of Ulster on the 17th day
of February, 1922, upon the decision of the court rendered after a
trial at the Ulster Trial Term, a jury having been waived.

The judgment included the dismissal of a counterclaim of the
defendant upon the merits.

*Franc & Becker* [*Alfred L. Becker* of counsel], for the appellant.

*Walter N. Gill,* for the respondent.

H. T. KELLOGG, Acting P. J.:

The only issue in the case is made by the affirmative allegations
of the defendant's answer setting forth a counterclaim, and the
denials and allegations of the plaintiff's reply.

The answer sets up a contract entered into between E. F. Drew
& Co., Inc., and the plaintiff on the 23d day of September, 1920.
By that contract E. F. Drew & Co., Inc., agreed to sell and the
plaintiff agreed to buy a quantity of soya bean oil. The quantity
agreed upon was " Two (2) Sellers tanks of about 60,000 pounds
each," and the price was " 10c per pound, f. o. b. Pacific Coast."
In relation to deliveries the contract contained the following:
" Deliveries — October, 1920. Shipment from Pacific Coast.
Buyer to supply seller with shipping instructions within forty-eight
(48) hours after request for same by seller." In relation to terms
it contained the following: " Terms — net cash. Sight draft
against Railroad Bill of Lading Certificate of Weight and Certificate
of Analysis." The answer alleged and the proof established that
all the rights of E. F. Drew & Co., Inc., arising under the contract
had been assigned to the defendant. The defendant seeks to recover
damages suffered through the refusal of the plaintiff to accept
delivery of one tank car of soya bean oil contracted for.

It would have been difficult for the defendant exercising ingenuity,
to have alleged or proven less. It failed to allege or prove that
shipping instructions, as required by the contract, were given by

the plaintiff, the buyer, to E. F. Drew & Co., Inc., the seller. It failed to allege that the tank cars, or either of them, were consigned by the seller to the plaintiff in accordance with instructions as to destination or otherwise. It failed to state the time when or the place whence the cars, or either of them, were shipped. It failed to state the place to which the cars were shipped. It introduced in evidence a letter from a third party, the New York Central Railroad Company, to the effect that the carload, which is the subject of this litigation, was " consigned to order Koster Company, notify Hauck Food Products Company." It failed to prove the relationship between " Koster Company " on the one hand and the plaintiff or E. F. Drew & Co., Inc., on the other.

The answer contained the following allegation: "*Fourth*. Upon information and belief, that thereafter, and prior to October 30, 1920, one tank car of soya bean oil to be shipped under said contract, arrived in Kingston, New York, and draft and documents covering same were duly presented to plaintiff, who paid said draft." It, also, alleged: "*Sixth*. Upon information and belief that the second tank car of soya bean oil to be delivered under said contract, containing 63,500 pounds of said oil, duly arrived in Kingston, New York, on or about November 4, 1920, and on or about the same day, in accordance with the terms of said contract, a sight draft in the sum of six thousand three hundred and fifty dollars ($6,350), covering invoice for said tank car of soya bean oil, together with the documents specified in said contract, was duly presented to plaintiff for payment and payment thereof was refused." These allegations were admitted by the reply.

It was thus admitted that one tank car, arriving at Kingston, N. Y., was paid for by the plaintiff. A letter, written by the plaintiff, is in evidence which shows that the " general office and works " of the plaintiff are at Kingston, N. Y. From these admissions and facts it may, perhaps, be a permissible inference that the place of destination agreed upon for the second car was Kingston, N. Y., and that its alleged arrival at such place was in fulfillment of the contract.

It was admitted that a sight draft for the contents of the second car, " together with the documents specified in said contract, was duly presented to plaintiff for payment and payment thereof was refused." The reply states: " That prior to the arrival of said tank car of oil at Kingston, New York, and prior to the presentment to the plaintiff for payment of the draft for $6,350, together with other documents specified in said contract, as alleged in paragraph or subdivision of the answer designated as ' Sixth ' " a certain notice was given by the plaintiff to E. F. Drew & Co., Inc. From these allegations it may, perhaps, be inferred that a bill of lading,

sufficient to place the plaintiff in immediate possession of the second tank car at the contract destination, together with a draft upon the plaintiff for the contract balance due, were tendered to the plaintiff, and a refusal to accept or pay was made.

If these inferences cannot properly be drawn, then, at most, is it true that the defendant failed to make a *prima facie* case. The plaintiff cannot support the judgment dismissing the counterclaim upon the merits, which it has obtained, by reasoning to the conclusion that no such case was made. We will assume, therefore, in order to test the judgment by the merits, that the seller tendered fulfillment of its promise to sell, that the plaintiff refused to fulfill its promise to buy, and that the case came to the plaintiff to establish legal justification for an avoidance of its contract obligation.

The contract contained the following term: " If before the completion of the contract either party thereto shall suspend payment, or become bankrupt or insolvent, the other party, upon notice being given to the defaulter, shall close the contract forthwith, any difference to be for the account of the defaulter." E. F. Drew & Co., Inc., the party contracting to sell the oil, became insolvent on the 30th day of October, 1920. On or about the 4th day of November, 1920, the plaintiff notified E. F. Drew & Co., Inc., that it elected under the contract clause to terminate the contract, and requested that it cancel the second car of oil. The car of oil arrived at Kingston, N. Y., on the 4th day of November, 1920. We have not definitely been informed, as already stated, when or from where the car was shipped. The contract called for the payment of a price " f. o. b. Pacific Coast," and for a " shipment from Pacific Coast." The proof shows that in the usual course of transportation, a shipment from the Pacific coast to Kingston, N. Y., would require thirty days' time. In considering the affirmative case of the plaintiff for a termination and avoidance of its contract, under the contract clause quoted above, we must assume, in the absence of proof by it to the contrary, that the car in question was shipped from the Pacific coast at least twenty-five days prior to the thirtieth day of October, the date when the shipper became insolvent. We must assume, also, the contrary not having been proven, that " The Koster Company," the consignee of the car, were the agents of the shipper. When a sale is made " f. o. b. the point of shipment " title passes from the seller to the buyer at the moment of delivery to the carrier, whether the bill of lading runs to the consignor, to the consignee or to the consignor's agent. (*Standard Casing Co. v. California Casing Co.*, 233 N. Y. 413.) Consequently, we must take it to be the truth that the title to the soya bean oil contained in the car thus consigned

passed on delivery to the railroad at the Pacific coast from the seller, E. F. Drew & Co., Inc., to this plaintiff, the purchaser. Such being the situation, the seller had fully performed its contract in every particular prior to the date when it became insolvent, and nothing thereafter remained by it to be done.

The plaintiff contends that because on the 30th day of October, 1920, the contents of the car had not been paid for by it there was no " completion " of the contract, and that the option to " close " the contract by refusing the shipment was still open to it under the quoted clause. We think the contention is not tenable. The sole purpose of the clause was to protect one party to the contract against possible defaults which might arise through the insolvency of the other party. In this case the party which became insolvent had already fully performed. The other party ran no further risk, and needed no further protection. It would be a strange perversion of the clause to hold that the party which had not performed the contract might urge against the party which had performed that, because of its own non-performance, there was no " completion " of the contract, and, therefore, that it might " close " the contract by continuing its non-performance. We think that the only method to " close " this contract which was open to the plaintiff was to pay the draft drawn upon it. We conclude that, upon the meagre facts proven, the plaintiff was not entitled to a dismissal upon the merits.

The judgment should be reversed and a new trial granted.

KILEY and VAN KIRK, JJ., concur; HASBROUCK, J., dissents.

HINMAN, J. (concurring):

I agree with the learned court below that the contract was not completed at the time, but I disagree as to the holding that the term " close the contract " meant the right to refuse payment for the goods, title to which had passed to the buyer before insolvency. (See 118 Misc. Rep. 31.)

Where one party sells another goods for a certain price, the contract is not completed on the delivery of the goods. Payment of the price must be made before it is completed. The fact that it is not completed in such a case gives a cause of action for the price. Mutuality is the essence of a contract.

Moreover, there was something else that was permitted the buyer in this case to be done before it could be required to pay for the oil. The buyer had the right of inspection on arrival of the oil. If the oil came up to the contract standard, nothing more on the part of the seller remained to be done. Delivery to the carrier passed title to the buyer. There was a potential per-

formance by the seller which became actual on the arrival and acceptance of the goods after inspection or on acceptance with a waiver of the right to inspect. If the goods were not up to the standard, the buyer might reject them, in which case performance by the seller would not then be even potential.

Therefore, for these two reasons, the contract was not completed. The payment of the price was essential and the right of inspection, even though title had passed, was a part of the agreement and cannot be ignored.

What was meant by " close the contract? " The trial court held, in effect, that it meant to assume an attitude of passivity, to consider that the contract was abrogated by the buyer's insolvency, leaving the parties as though no contract had ever been made, and thus permitting a refusal of the shipment and of payment therefor. This is not the meaning. The provision giving the party the right to " close the contract forthwith, any difference to be for the account of the defaulter," has latent in it the idea of action. Something must be done; action must be taken; the matter must be immediately wound up. A " difference " must be charged to the account of the " defaulter," if there should be a difference. But before the party can take such action, the contract presumes that the insolvent shall be found to be a " defaulter." If the insolvent is not in default, the clause has no application. If he is in default, the buyer may protect himself by buying in the open market, and by debiting or crediting the " difference " between the contract and buying prices to the " account of the defaulter."

In this case title had passed. The goods belonged to the Hauck Food Products Corporation. If the goods came up to the standard, the seller was not in default and the buyer could not be said to be protecting itself by rejecting them, because it would be rejecting its own goods. The performance of the contract had progressed so far that all the buyer could do was to examine the goods and if they came up to the standard, to accept them, since the goods were its property. Then it must pay the contract price. If the goods were not up to standard, it had the right to reject the goods and to presume that the seller, being insolvent, could do nothing else by way of performance. Closing out the contract would then consist of rejecting the goods and of going into the market to buy the goods contracted for, charging the " difference " in price, if any, to the account of the seller.

When the Hauck Food Products Corporation refused to accept the goods, it was simply refusing to accept goods which belonged to itself and when it refused to examine the goods it refused to protect itself in the only possible way open to it. As the matter

then stood, there was no right to " close the contract " within the meaning of the clause in question and the Hauck Food Products Corporation is obligated to pay the damages arising out of its own default. The counterclaim was improperly dismissed upon the merits.

I concur in the conclusion of Mr. Justice KELLOGG that the judgment should be reversed and a new trial granted.

HASBROUCK, J. (dissenting):

I find myself unable to assent to the conclusion of the presiding justice that the judgment dismissing the counterclaim ought to be reversed.

The counterclaim is based upon a contract between the plaintiff and E. F. Drew & Co., Inc., for the sale of a quantity of soya bean oil to be delivered f. o. b. San Francisco for shipment to the plaintiff at Kingston, N. Y.

The contract contained the following provisions: " If before the completion of the contract either party thereto shall suspend payment, or become bankrupt or insolvent, the other party upon notice being given to the defaulter, shall close the contract forthwith, any difference to be for the account of the defaulter."

It is the duty of parties to a contract to carry it out according to its terms and spirit and not to attempt to avoid it because the market for the commodity sold happens to be falling rather than rising. The plaintiff seeks to avoid the claim of the defendant that he should pay for the oil by maintaining that the contract contains terms excusing him.

Plaintiff asserts that before the completion of the contract the defendant became insolvent. This claim would constitute an excuse for refusal to receive the shipment and pay for it if it were well founded.

The defendant claims it is not well founded for two reasons: *First*, that the contract had been completed at the time of plaintiff's refusal to pay the draft made upon it for its oil. There is no division of opinion upon the question as to whether by completion is meant completion of the making of the contract or embraces completion of performance. I incline to the view that there can be no completion of a contract between the makers until both sides have carried the contract through by performance, and agree with the view of the presiding justice that a party cannot claim a benefit under a contract by reason of his own failure to perform. That would simply amount to giving a reward to a party because of his own wrong.

The defendant claims and it is the law that, by a delivery of the subject of sale f. o. b., there was, under the Sales Act of New York

State and the common law which is presumed in the absence of proof to be the law of California, passage of title from the defendant to the plaintiff. The bill of lading, however, did not run to the plaintiff; it was made out to the Koster Company, as consignees. But that incident of the case does not affect the rule with regard to the title, the effect of such action being merely to retain a property right in order to secure the purchase price of the goods. (*Standard Casing Co.* v. *California Casing Co.*, 233 N. Y. 417.)

Wherever the title was, the possession and the right to possession of the property remained in the shipper and was so to remain until the property was paid for. (Pers. Prop. Law, § 101, subd. 2.)

Still stands the ancient legal monument, " possession is nine points of the law." But the defendant agreed that if he became insolvent before the completion of the contract, the plaintiff need not pay. Three things in order to complete the contract were necessary to be done. The tender of the goods and the offer of the money and the acceptance of both by the parties. It is the misfortune of the defendant that insolvency overtook it on October 30, 1920. The effect of that insolvency was the appointment of receivers by the decree of the United States District Court of the Southern District of New York filed that day. By the terms of that decree Lowenthal and Farleigh were appointed receivers, among other things, " of all its [defendant's] contracts, rights and choses in action;" the defendant company, its officers, agents, directors and employees (were) forthwith commanded " to turn over and deliver to the receivers　*　*　*　all　*　*　*　contracts bills, notes, accounts, moneys;" the defendant, its officers and employees (were) enjoined from " interfering with defendant's property　*　*　*　or interfering with the possession or management thereof; and all persons　*　*　*　(were) enjoined from　*　*　* taking possession of any property of the defendant."

As a general rule the right of a receiver to the possession of property vests in him by virtue of his appointment and at the time of his appointment. (Tardy's Smith Receivers, 128.)

If he is required to give bond, upon furnishing such bond his possessory rights relate back to the time of his appointment. (Id. 141.)

The goods in question reached Kingston November fourth, and by that time the plaintiff had become aware of the insolvency of the defendant. At the time of the notice to the plaintiff that the oil had arrived and that the draft was there, neither the defendant nor any agent of it had any right to present the draft and the plaintiff had no right to pay the money to the defendant for it was under injunction restraining it from receiving the money. Again the receivers had the right to the possession of the property

and they had the right to say whether they would repudiate the contract or adopt it. They were not obliged to perform an executory contract entered into prior to their appointment. (Id. 154.)

Looking back to discover the purpose of placing the insolvency clause in this contract, it is not difficult to see that it was to save the party from the complications which grow out of dealing with insolvents. Here if the plaintiff had paid the draft of E. F. Drew & Co., Inc., and the money had been withheld from the receivers, they would have had a right to demand and to recover the oil or the money from the plaintiff. Plaintiff would have been in peril of having to pay twice.

If the plaintiff had paid the draft and the shipment turned out upon examination to be deficient in quantity or quality, the claim of the plaintiff would have had to hang upon the slow pace of an insolvency administration by the court — upon the law's delay.

The instant case presents just such a situation as the contract was designed to cover. Again it is claimed by the defendant that plaintiff should not prevail for the reason that in attempting to avail itself of the provisions of the contract it pursued the wrong method. Defendant asserts that the trade significance of the word " close " is that the buyer should sell and " credit the difference to the party who contracts." This definition in the record seems unintelligible.

To claim that the purchaser should pay and then sell for whom it might concern is to take away from the purchaser the very privilege of escape from insolvent complication which the contract was designed to secure. The purchaser certainly could not sell until he possessed, for he could not deliver. The contract, therefore, does not contemplate that he could complete it in order to " close " for such action would amount to a contradiction of its terms.

Whatever " close " might mean with reference to the seller whose buyer had failed to pay; to the buyer it cannot mean anything but ending or canceling the contract.

Here the plaintiff by its letter of November fourth sought to accomplish such a result.

I agree with the trial court that plaintiff succeeded in its effort, and favor for the reasons assigned the affirmance of the judgment, with costs.

Judgment reversed on the law and facts and new trial granted, with costs to the appellant to abide the event. The court disapproves of finding of fact numbered ten, and of that part of the first conclusion of law which finds the fact that the plaintiff closed, terminated and ended the contract.